IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**BEVERLY CHAPMAN,**                      Case No. 1:18 CV 1616

    Plaintiff,                            Judge Pamela A. Barker

    v.                                    Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                            REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiff Beverly Chapman ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated July 13, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in May 2015, alleging a disability onset date of July 3, 2012. (Tr. 173). Her claims were denied initially and upon reconsideration. (Tr. 121-24, 127-29). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 134-35). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on May 17, 2017. (Tr. 34-85). On October 4, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-25). The Appeals Council denied Plaintiff's request for review, making the

hearing decision the final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on July 13, 2018. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Plaintiff was born in 1962, making her 54 years old at the hearing. *See* Tr. 40. She had a bachelor's degree in communications (Tr. 46), and past work in the corporate training industry (Tr. 48-49).

Plaintiff was terminated from her last job due to "erratic behavior" in the workplace. (Tr. 46). She was not "dealing with clients and colleagues well", and experienced auditory and visual hallucinations, "sobbing episodes", and mood swings. *Id*. She noted her behavioral and mental health problems had "progressed a lot" since 2012. (Tr. 55). Plaintiff denied that a single traumatic event caused a decline, but instead she gradually "started having reactions that [she] knew weren't normal". *Id*.

Plaintiff experienced visual hallucinations, seeing and conversing with people who "look as real to me as you look to me right now." (Tr. 56). She had become familiar with certain people by voice and appearance, describing them as "motorcycle people". (Tr. 57). Plaintiff noted the people were supportive, offered consolation, and provided positive affirmations. (Tr. 58). Sometimes Plaintiff only heard voices and did not see faces. *Id*. These hallucinations mostly occurred at home, but sometimes in public. (Tr. 59). Since she started treatment, Plaintiff's hallucinations were less frequent. *Id*.

Plaintiff also described mood swings. (Tr. 59-60). Occasionally she woke in the morning feeling depressed – a feeling which sometimes lasted a week and sometimes lasted only the day. (Tr. 60). She had "blow-up episodes" where she overreacted, or otherwise reacted inappropriately,

to something that made her angry. *Id*. Plaintiff also experienced panic attacks where she felt sweaty, shook, had weak legs, and fled whatever setting she was in. (Tr. 60-61). She had approximately three panic attacks per week which lasted fifteen to twenty minutes each. (Tr. 62).

Plaintiff lived with her elderly mother (Tr. 41), who she testified was the only person with whom she got along. (Tr. 66). She was estranged from her father and only sibling. *Id*. Plaintiff did not grocery shop and did not participate in household chores due to concentration problems. (Tr. 66-67). She did not have any hobbies and slept most of the day. (Tr. 67-68). Plaintiff was afraid to leave her home due to "agoraphobic tendencies". (Tr. 69).

Relevant Medical Evidence

Plaintiff treated with her primary care physician Richard McBurney, M.D., and a nurse practitioner within his office, a total of three times between 2013 and 2015. *See* Tr. 266-79, 289-92. Dr. McBurney treated Plaintiff for panic disorder without agoraphobia and generalized anxiety disorder. (Tr. 269-70, 272-73, 289-90). He prescribed Lexapro and clonazepam (Tr. 271, 273, 290), noted her symptoms were "well controlled" on the medications (Tr. 269), and helped her symptoms "considerably" (Tr. 289). Dr. McBurney also found Plaintiff's affect appropriate to her mood. *See* Tr. 271, 291.

Plaintiff underwent a consultative examination with psychologist Charles Misja, Ph.D., in June 2014. (Tr. 255-61). Plaintiff reported living in a "continual state of dread expecting the worst", and that worrying "overwhelm[ed]" her. (Tr. 256). She expressed difficulty maintaining personal relationships and dealing with workplace stress. *Id*. Plaintiff told Dr. Misja she was terminated from a job as a software applications trainer because she walked out of meetings, hung-up on conference calls, and could not get along with supervisors or coworkers. (Tr. 257). She did not belong to any social groups or organizations and did not have any hobbies or interests. (Tr.

258). Plaintiff had a "close" relationship to her brother. *Id*. She showered every two to three days, managed her own finances, cooked for herself, and did her laundry once per month. *Id*. On a typical day, Plaintiff woke at noon, had coffee, took her medication, and watched television most of the day. *Id*.

On examination, Dr. Misja found Plaintiff dressed appropriately, was adequately groomed, made good eye contact, and did not appear to exaggerate her symptoms. *Id*. He found she was direct in her conversation with good flow and was verbose and articulate. *Id*. Plaintiff had a constricted affect and depressed and stable mood. *Id*. She rated her depression as a "six", but added it recently was "as high as eight". *Id*. She did not have any suicidal thoughts. *Id*. Plaintiff reported that her depression "never stopped her from functioning and even now [] has no difficulty getting out of bed for the day." *Id*. She reported a "drastic" change in her quality of life because she lived with her parents, including her father who was "difficult to cope with." *Id*. Plaintiff had no anger towards herself, but was angry with others due to "anticipated mistreatment". (Tr. 259). She rated her anxiety as a "ten" but stated, "I'm able to function". *Id*. Plaintiff was fine by herself, but did not have interest in social settings. *Id*. Dr. Misja found no evidence of visual or auditory hallucinations or delusions. *Id*. She was oriented with no sign of grandiosity, religious or sexual preoccupations, suspiciousness, or aggression. *Id*. Dr. Misja found Plaintiff functioned in the average range of intelligence. *Id*. She had good insight and fair judgment. (Tr. 260). He diagnosed major depression (moderate), generalized anxiety disorder, and personality disorder (not otherwise specified). *Id*.

In August 2015, Plaintiff underwent a second consultative examination with psychologist Alison Flowers, Psy.D. (Tr. 294-301). Plaintiff reported losing three jobs due to psychological problems. (Tr. 294-96). She noted that she was easily annoyed, could not focus, and could not get

4

along with her coworkers. (Tr. 296). Plaintiff reported that she took her prescribed medications (Lexapro and clonazepam) daily (Tr. 295), and they helped "somewhat" (Tr. 296). Plaintiff described her typical mood as "sad and depressed". (Tr. 297). She further reported panic attacks, difficulty concentrating, dysphoric moods, loss of usual interests, a diminished sense of pleasure, irritability, and social withdrawal. *Id*. Plaintiff reported that she could dress, bathe, and groom independently. *Id*. She could not cook or prepare food due to an inability to concentrate. *Id*. She did "a little" cleaning and shopped for herself in "small stores" such as Walgreens. *Id*. Plaintiff reported that she was unable to manage her own finances, and was going through bankruptcy. *Id*. She drove independently. *Id.*

On examination, Dr. Flowers found Plaintiff had an open demeanor with appropriate social skills. (Tr. 298). She was appropriately dressed, well-groomed, and had appropriate eye contact. *Id*. Plaintiff had fluent speech, a clear voice, coherent thought process, and goal-directed thoughts with no evidence of hallucinations, delusions, or paranoia. *Id*. She had a restricted affect and appeared anxious throughout the appointment. *Id*. Plaintiff had a neutral mood and euthymic affect. *Id*. She was oriented to person, place, and time and had "mildly impaired" attention and concentration. *Id*. Plaintiff had good insight, fair judgment, and was in the average range of intelligence. (Tr. 299). Dr. Flowers diagnosed generalized anxiety disorder, panic disorder, and unspecific depressive disorder. *Id*. Further, Dr. Flowers offered a "guarded" prognosis because Plaintiff reported problems related to anxiety and depression and she was not receiving mental health treatment for those symptoms. *Id*. She opined that Plaintiff's prognosis might improve with treatment. *Id*.

Plaintiff began treating with counselor Andrea Brown, LPC, in December 2015. *See* Tr. 305. At her initial visit, Plaintiff reported anxiety symptoms and mood changes. (Tr. 306). On

examination, Plaintiff's mood and affect were within normal limits; she made steady eye contact, was oriented, had normal speech, intact memory, average intellect, fair judgment, and a normal thought process. (Tr. 305). Ms. Brown diagnosed major depressive disorder, single episode. (Tr. 308).

Plaintiff attended several counseling visits with Ms. Brown in January and February 2016. (Tr. 323-65). During the visits Plaintiff reported anxiety symptoms (Tr. 323, 332, 336, 340, 348, 356, 364-65), depression symptoms (Tr. 336, 344), and difficulties with social situations (Tr. 323, 332, 364-65). On examination, Ms. Brown consistently found Plaintiff had an anxious mood, appropriate affect, good concentration, and good or fair judgment. (Tr. 330, 334, 338, 342, 346, 350, 354, 358, 362).

Later in January 2016, Plaintiff underwent a third consultative examination with psychologist Amber Hill, Ph.D. (Tr. 310-19). Plaintiff reported a family history of psychiatric concerns, describing her father as having "rages". (Tr. 311). She got along with her mother, but had a strained relationship with her father, and was estranged from her brother. *Id*. Plaintiff had no other socialization and no hobbies or interests. *Id*. She spent the majority of her day watching television and attending doctor's appointments. *Id*. If she arrived at an appointment early, she would stop and get a cup of coffee close to the building. *Id*. Plaintiff reported taking Lexapro and clonazepam, *id*., and described the medication as "helpful" (Tr. 312). She was terminated from her last job because she had difficulty getting along with her coworkers. *Id*. Plaintiff reported feeling "very, very sad" most days. (Tr. 313). Plaintiff suggested that she had symptoms of mania, detailing "spending binges" during periods of happiness. *Id*. She reported three panic attacks per week and that she only left the house to attend appointments. (Tr. 314). Plaintiff was able to dress, bathe, and groom herself but did so infrequently. *Id*. She did not cook or prepare simple meals,

6

instead relying on her mother's friend to bring over take-out meals. (Tr. 314-15). She reported that she was able to manage her own finances. (Tr. 315).

On examination, Dr. Hill found Plaintiff appropriately dressed and well groomed. *Id.* She noted Plaintiff demonstrated normal posture and motor behavior with appropriate eye contact, but visibly shook during most of the session. *Id*. Plaintiff had fluent speech and a clear voice with coherent goal-directed thoughts. *Id*. There was no evidence of hallucinations, delusions, or paranoia. *Id*. Dr. Hill found Plaintiff had a restricted and flat affect with a dysthymic mood. *Id*. Plaintiff was anxious throughout the session. *Id*. Her concentration and attention appeared mildly impaired, as did her recent and remote memory skills. (Tr. 315-16). Dr. Hill found Plaintiff's intellectual functioning to be normal. (Tr. 316). She diagnosed panic disorder, generalized anxiety disorder, and persistent depressive disorder and offered a "guarded" prognosis due to Plaintiff's lack of full symptom control or relief. (Tr. 316-17) ("Although the claimant suggests that she has some good benefit from her mental health medication prescribed by her primary care provider for the past seven years, the claimant does not have full symptom control or relief.").

Plaintiff began treating with psychiatrist Thomas Thysseril, M.D., in April 2016. *See* 385-90. At her initial visit, Plaintiff reported a variety of symptoms including: nocturnal sleep habits, rapid speech, road rage, trust issues, fluctuating mood, and distractibility. (Tr. 385). She reported staying at home most of the day; she did not participate in chores or cooking, and showered approximately once per week. *Id*. Plaintiff also noted that she angered easily. *Id*. Dr. Thysseril noted Plaintiff had no active hallucinations. *Id*. On examination, Plaintiff was cooperative, made good eye contact, and appeared casually dressed with "improved" hygiene. (Tr. 388). She had a mixed mood and a labile, guarded, affect. *Id*. Plaintiff had fair impulse control, judgment, and insight. *Id*. Dr. Thysseril diagnosed bipolar disorder (mixed, moderate), anxiety disorder, and

assigned a Global Assessment of Functioning ("GAF") score of 60[1]. (Tr. 389). He adjusted Plaintiff's medications. *Id.*

Plaintiff saw Dr. Thysseril from April to November 2016. (Tr. 391-425, 454-77). Throughout this period, Plaintiff's reported symptoms included anger (Tr. 391, 396), anxiety (Tr. 454, 464), depression (Tr. 411), and paranoia (Tr. 401, 459). Plaintiff reported a visual hallucination of a man on a bicycle in September 2016 (Tr. 459), and auditory hallucinations in November 2016 (Tr. 474). On a few occasions, Dr. Thysseril described Plaintiff as being "calmer" than usual (Tr. 406, 464, 469) or less paranoid (Tr. 406, 416, 421). On examination, Plaintiff's mood varied from "mixed" (Tr. 393, 398), "expansive" (Tr. 418, 461, 476), and depressed (Tr. 413) to "calmer" (Tr. 408, 423, 456, 471) and "less depressed" (Tr. 403). Plaintiff's affect also varied from "guarded" (Tr. 393, 398), "restricted" (Tr. 418, 423, 456, 471), "tearful" (Tr. 413), and "labile" (Tr. 461, 466, 476) to "less guarded" (Tr. 403, 408). Dr. Thysseril consistently described Plaintiff as "cooperative" with good eye contact, but noted psychomotor retardation was also present. (Tr. 393, 398, 403, 408, 413, 423, 456, 461, 476). He found Plaintiff's recent and remote memory intact and consistently noted Plaintiff had fair impulse control, insight, and judgment; he maintained a diagnosis of bipolar disorder, anxiety disorder, and consistently assigned a GAF score of 60 or 65. (Tr. 394, 399, 404, 409, 414, 418-19, 424, 457, 462, 467, 472, 477).

---

1. A GAF score is a "clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503, n.7 (6th Cir. 2006). A score between 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed., Text Rev. 2000) ("*DSM-IV-TR*").

Plaintiff underwent a battery of cognitive testing in August 2016 with consultative examiners Matthew Liptensky, M.A., P.C. (a counselor) and Deborah Koricke, Ph.D (a psychologist). (Tr. 427-30). Wechsler Adult Intelligence Scale testing revealed Plaintiff fell in the low average range of overall mental abilities. (Tr. 427-28). She was in the low average range in the area of verbal comprehension; borderline in perceptual reasoning; and low average in the area of attention and concentration. (Tr. 428). Plaintiff's processing speed fell within the average range. *Id*. Plaintiff also underwent Integrated Visual and Auditory Continuous Performance Testing ("IVA-CPT") to assess her overall attention and concentration. (Tr. 429). Results indicated Plaintiff fell within the "impaired" range in all areas of functioning related to attention consistent with someone suffering from attention deficit hyperactivity disorder ("ADHD"). *Id*. These providers also administered the Minnesota Multiphasic Personality Inventory -2- Revised Format ("MMPI-2-RF") to assess psychopathology and maladaptive personality functioning. (Tr. 430). Plaintiff's score was indicative of someone likely exaggerating their symptoms; it was thus likely invalid. *Id*. Mr. Liptensky and Dr. Koricke noted, however, that Plaintiff "was not perceived to be attempting to feign an illness and appeared to be attempting to put forth a consistent effort." *Id.*

Plaintiff reported to the emergency room in January 2017 for suicidal thoughts (Tr. 582, 588); she was admitted (Tr. 590). On examination, Plaintiff was actively engaged in her interview, was pleasant and courteous, and came across as "open and unguarded". (Tr. 592). Her speech was somewhat rapid. *Id*. Plaintiff's mood was mildly hypomanic and her affect congruent. *Id*. She had fair insight and judgment, was somewhat distracted by racing thoughts, and had "excellent" recent and remote recall. *Id*. Providers diagnosed bipolar mood disorder, hypomanic. *Id*.; *see also* Tr. 594 (discharge summary).

Opinion Evidence

*Treating Physician*

Dr. Thysseril completed a medical source statement in March 2017. (Tr. 948-53). In it, he listed Plaintiff's diagnosis as bipolar disorder with a GAF score of 65[2]. (Tr. 948). He also listed Plaintiff's symptoms and medications. (Tr. 948-49). Dr. Thysseril opined Plaintiff had unlimited ability to adhere to basic standards of neatness and cleanliness. (Tr. 952). When asked his opinion on Plaintiff's ability to ask simple questions or request assistance, Dr. Thysseril checked two boxes indicating that she was both "unlimited or very good" and "unable to meet competitive standards" in her ability to ask simple questions or request assistance. *See* Tr. 950. He found she was "limited but satisfactory"[3] in her ability to maintain regular and punctual attendance; make simple work-related decisions; perform at a consistent pace without an unreasonable number of rest periods; and set realistic goals or make plans independently of others. (Tr. 950, 952). Dr. Thysseril found Plaintiff "seriously limited"[4] in her ability to carry out very short and simple instructions; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in a routine work setting, understand, remember, and carry out detailed instructions; interact appropriately with the public; maintain socially appropriate behavior; and travel in

---

2. A GAF score between 61-70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household)". *DSM-IV-TR* at 34.

3. The form defines "limited but satisfactory" as a "noticeable difficulty (e.g. distracted from job activity) no more than 10 percent of the workday or work week." (Tr. 950).

4. The form defines "seriously limited" as a "noticeable difficulty (e.g. distracted from job activity) from 11 to 15 percent of the workday or work week." (Tr. 950).

unfamiliar places. *Id*. He found she was "unable to meet competitive standards"[5] in her ability to maintain attention for a two-hour segment; work in coordination with or proximity to others without being distracted; and complete a normal workday (or workweek) without interruptions from psychologically based symptoms. (Tr. 950). When asked to explain these limitations, including the medical/clinical findings in support, Dr. Thysseril left the questions blank. (Tr. 950, 952). Dr. Thysseril opined Plaintiff had a mild limitation in her ability to understand, remember, or apply information. (Tr. 951). He found a moderate limitation in her ability to interact with others and maintain attention, concentration, persistence, or pace. *Id*. Dr. Thysseril found a marked limitation in Plaintiff's ability to adapt or manage herself. *Id*. He did not offer an opinion on absenteeism (Tr. 951) and left blank a question which asked "[i]f stress tolerance is an issue, what demands of work does this patient find stressful?" (Tr. 953). Finally, Dr. Thysseril did not answer when asked if Plaintiff impairment lasted (or could be expected to last) at least twelve months. (Tr. 951).

*Examining Physicians*

In June 2014, Dr. Misja opined Plaintiff functioned in the average range of intelligence and would be able to understand and implement ordinary instructions. (Tr. 261). She would have "minimal" problems in her ability to maintain attention and concentration, maintain persistence and pace, and perform simple and multi-step tasks. *Id*. He opined Plaintiff would have "severe" problems responding appropriately to supervision and coworkers due to a "significant personality disorder". *Id*. Dr. Misja also found Plaintiff would have "severe" problems in her ability to respond appropriately to work pressures, depending on the particulars of the job. *Id*. By way of example,

─────────────────

5. The form defines "unable to meet competitive standards" as a "noticeable difficulty (e.g. distracted from job activity) from 16 to 25 percent of the workday or work week." (Tr. 950).

he noted that if Plaintiff traveled for work (as she did in the past) that she may "be able to hide her problem". *Id*. Finally, Dr. Misja opined Plaintiff could manage her own finances. (Tr. 260).

In August 2015, Dr. Flowers opined Plaintiff would have some limits in her ability to understand and carry out instructions based on the observation that Plaintiff required repetition of some instructions during the examination. (Tr. 300). Dr. Flowers opined Plaintiff was likely limited in her ability to perform multi-step tasks. *Id*. She noted that, although Plaintiff appeared to be able to sustain attention and concentration during the appointment, there were some deficits in this area on examination. *Id*. She further noted that Plaintiff reported difficulty performing multi-step tasks at work in recent years. *Id*. She observed Plaintiff appeared anxious during the appointment and noted this might impact Plaintiff's ability to respond appropriately to pressures in a work setting. (Tr. 301). In considering Plaintiff's ability to respond appropriately to supervisors or coworkers in a work setting, Dr. Flowers described Plaintiff's subjective reports of anger and irritability in social settings, but also found that, during the exam, she was able to interact appropriately. *Id*. Further, she pointed out that Plaintiff's reporting of her socialization abilities was "somewhat inconsistent", and she drove with a friend to her appointment that day. *Id*.

In January 2016, Dr. Hill opined Plaintiff had mild impairment in her ability to understand, remember, and carry out instructions due to her impaired remote memory skills and self-reported difficulties in carrying out instructions. (Tr. 318). She found Plaintiff limited in her ability to maintain attention and concentration and persistence and pace, as well as to perform some multi-step instructions, due to her self-reported distress with her anxiety and depression symptoms. *Id*. She opined Plaintiff could perform simple tasks, and some multi-step tasks. *Id*. Dr. Hill further found Plaintiff limited in her ability to respond appropriately to supervision and coworkers. (Tr. 319). In support, she cited of Plaintiff's depression and anxiety related symptoms as well as their

12

interactions within the clinical setting. *Id*. Finally, Dr. Hill found Plaintiff limited in her ability to respond appropriately to work pressures in a work setting due to her observed and reported symptoms of anxiety and depression. *Id*.

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 77-84. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was physically and mentally limited in the way in which the ALJ determined Plaintiff to be. *See* Tr. 78-80. The VE opined such an individual could not perform Plaintiff's past work, but could perform other jobs such as an industrial cleaner, linen room attendant, and a hospital cleaner. (Tr. 78-81).

ALJ Decision

In a written decision dated October 4, 2017, the ALJ found Plaintiff met the insured status requirements for DIB through September 30, 2019 and had not engaged in substantial gainful activity from since her alleged onset date (July 3, 2012). (Tr. 17). He concluded Plaintiff had severe impairments of: depression, anxiety, personality disorder, ADHD, degenerative disc disease, fibroids, and ovarian cysts, but found these impairments (alone or in combination) did not meet or medically equal the severity of a listed impairment. (Tr. 18). The ALJ then found Plaintiff had the residual functional capacity ("RFC"):

> to perform medium work as defined in 20 CFR 404.1567(c) except for the following limitations. The claimant can perform occasional left overhead reaching. The claimant cannot climb ladders, ropes, or scaffolds. The claimant can have no exposure to hazards such as unprotected heights or moving mechanical parts. The claimant must avoid concentrated exposure to dust, odors, fumes, and pulmonary irritants. The claimant cannot perform work involving fast paced or high production quota standards. The claimant can have occasional and superficial interaction with supervisors and coworkers, meaning no arbitration, mediation, confrontation, negotiations, supervising others, or commercial driving. The claimant can have no

interaction with the public. The claimant can tolerate few changes in the work
setting, defined as occasional.

(Tr. 19). The ALJ found Plaintiff was unable to perform past relevant work; was defined as "a

younger individual" on the date last insured, and had at least a high school education. (Tr. 24). The

ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there were

jobs that existed in significant numbers in the national economy that Plaintiff could have

performed. *Id*. Thus, the ALJ found Plaintiff not disabled from the alleged onset date, July 3, 2012,

through the date of the decision. (Tr. 25).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &*

*Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact

if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*,

474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or

indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a),

1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ's mental RFC is unsupported because the ALJ failed to properly evaluate the medical opinion evidence from her treating physician and the three consultative

examiners. Plaintiff also argues the ALJ mischaracterized, or "cherry picked", the evidence of record. The Commissioner responds that the ALJ's decision is supported by substantial evidence. For the reasons discussed below, the undersigned recommends the decision of the Commissioner be affirmed.

<u>Treating Physician</u>

Plaintiff first argues the ALJ did not provide the required "good reasons" when assigning partial weight to the opinion of her treating psychiatrist, Dr. Thysseril. (Doc. 14, at 11-17). The Commissioner responds that the ALJ's analysis is supported by substantial evidence. (Doc. 17, at 10-12). For the reasons discussed below, the undersigned finds the ALJ's analysis satisfies the regulatory requirement and recommends the decision be affirmed in this regard.

It is well accepted that medical opinions of treating physicians are accorded greater deference than non-treating physicians.[6] *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with

---

6. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Importantly, when the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). These reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544 (quoting SSR 96-2p, 1996 WL 374188, at *5). When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, she is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

Here, the ALJ addressed Dr. Thysseril's opinion and gave several reasons for assigning it partial weight:

> The source opined the claimant to have mild limitation in understanding, remembering, and applying information; moderate difficulties interacting with others; moderate difficulties maintain concentration, persistence, or pace; and marked difficulties adapting or managing oneself. The claimant would have serious limitations in multiple areas of performing work, including in carrying out detailed instructions and interacting appropriately with others. Though a long-term treating source, Dr. Thysseril's opinion is internally inconsistent, as marked limitations were found in at least one paragraph B criteria but no greater than "serious" limitation in functioning at different aspects of work. The opinion is also unsupported by treating records, particularly counseling records but also Dr. Thysseril's own records, which gave GAF scores in the 60-65 range, indicating mild to moderate symptoms. Though GAF scores are not dispositive or binding, the

consistency of the scores in treating notes are given some weight in light of limited findings on his treating notes of persisting significant behavioral abnormalities.

(Tr. 23). The undersigned finds these given reasons are supported by substantial evidence and sufficient to satisfy the "good reasons" requirement.

First, the ALJ found Dr. Thysseril's opinion internally inconsistent – finding "marked limitations" in one paragraph B criteria, but lesser limitations in other aspects of mental functioning in a work setting. *Id*. Paragraph B of each mental listing (except 12.05) is used:

> to evaluate how your mental disorder limits your functioning. These criteria represent the areas of mental functioning a person uses in a work setting. They are: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 12.00. Dr. Thysseril opined Plaintiff had a mild limitation in her ability to understand, remember, or apply information. (Tr. 951). He found a moderate limitation in her ability to interact with others and maintain attention, concentration, persistence, or pace; and a marked limitation in Plaintiff's ability to adapt or manage herself. *Id*. However, earlier in his opinion, Dr. Thysseril checked boxes indicating Plaintiff was "limited but satisfactory", in her ability to maintain attendance, make simple work-related decisions, or perform at a consistent pace. (Tr. 950). He found Plaintiff "seriously limited" in her ability to carry out short simple instructions, accept instructions and respond to criticism from supervisors, and respond appropriately to changes in a routine work setting. *Id*. The ALJ's conclusion that many of the opinions within Dr. Thysseril's medical source statement are internally inconsistent is supported by substantial evidence and is a "good reason" for discounting the opinion. *Bernola v. Comm'r of Soc. Sec.,* 127 F. Supp. 2d 857, 863 (N.D. Ohio 2015) (internal inconsistency a valid reason to discount opinion evidence); *Shells v. Colvin*, 2016 WL 3027062, at *4 (N.D. Ohio)

18

(same); *see also Render v. Sec'y of Health & Human Servs.*, 1989 WL 34104, at *3 (6th Cir.) (unpublished table disposition) (same).

Next, the ALJ found Dr. Thysseril's opinion unsupported by his own treatment notes where he consistently assigned a GAF score of 60 or 65, and were unsupported by Ms. Brown's counseling records. (Tr. 23). The undersigned finds these reasons, which implicate the factors of consistency and supportability, *see* 20 C.F.R. § 404.1527(c)(3)-(4), also supported by substantial evidence. *See also Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ is correct that Dr. Thysseril consistently assigned Plaintiff a GAF score of 60 or 65. (Tr. 394, 399, 404, 409, 414, 424, 457, 462, 467, 477). The Sixth Circuit "take[s] a case by case approach to the value of GAF scores." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836 (6th Cir. 2016). GAF scores are a "subjective rating of an individual's overall psychological functioning," *Kennedy v. Astrue,* 247 F. App'x. 761, 766 (6th Cir. 2007), and they "may be of considerable help to the ALJ in formulating the RFC." *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir. 2002). This is so because the scores "allow[] a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kennedy*, F. App'x at 766. In the Sixth Circuit, an ALJ may discount a treating physician's opinion based, at least in part, on a contradictory GAF score. *See Gribbins v. Comm'r Soc. Sec. Admin.*, 37 F. App'x 777, 779 (6th Cir. 2002) (finding a treating physician's opinion properly rejected because it was contradicted by other medical evidence, including another treating physician's GAF score). Here, by consistently assigning Plaintiff GAF scores of 60 or 65 from April to November 2016 (*see* Tr. 389, 394, 399, 404, 409, 414, 419, 424, 457, 462, 467, 472, 477), Dr. Thysseril expressed his opinion that Plaintiff exhibited mild or moderate symptoms. *DSM-IV-TR* at 34. The ALJ concluded these findings contradicted the severe limitations offered by Dr. Thysseril in his

medical source statement. (Tr. 23). Finally, the ALJ found Dr. Thysseril's limitations were inconsistent with Plaintiff's counseling records. *Id.* As detailed above, though Ms. Brown noted Plaintiff reported anxiety symptoms (Tr. 323, 332, 336, 340, 348, 356, 364-65), depression symptoms (Tr. 336, 344), and difficulties with social situations (Tr. 323, 332, 364-65); on examination, she consistently found Plaintiff had an appropriate affect, good concentration, and good or fair judgment. (Tr. 330, 334, 338, 342, 346, 350, 354, 358, 362). The ALJ concluded these findings contradicted the severe limitations offered by Dr. Thysseril and this reason is supported by substantial evidence.

In support of her position, Plaintiff cites several records which she argues the ALJ should have given more weight or specifically addressed when evaluating Dr. Thysseril's opinion. However, it is not the job of this Court to re-weigh the evidence. And, importantly, an ALJ can consider all the evidence in a case without directly addressing each piece in his written decision. *Kornecky*, 167 F. App'x at 508. Further, it is a well-established principle that, even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. And, as discussed, the ALJ's analysis of Dr. Thysseril's opinion provided the required "good reasons", supported by substantial evidence, to assign it partial weight. Thus, the undersigned recommends the Commissioner's decision be affirmed in this regard.

Examining Physicians

Next, Plaintiff challenges the ALJ's evaluation of each consultative examiner. (Doc. 14, at 18-21). She argues the ALJ's reasoning regarding the consultative examiner opinions is internally inconsistent. Specifically, she contends it was inconsistent for the ALJ to discount Dr. Misja's social functioning limitation because it lacked any specific functional limitations, yet give great

weight to the opinions of Drs. Hill and Flowers who similarly did not offer any specific functional limitations. (Doc. 14, at 19-22). The Commissioner responds that the ALJ's analysis of these opinions is supported by substantial evidence. (Doc. 17, at 12-15). For the reasons discussed below, the undersigned finds no error and recommends the ALJ's decision be affirmed.

As an initial matter, an examining, but not treating, source is one who has examined Plaintiff, but did not have an ongoing treatment relationship. 20 C.F.R. §§ 404.1527 and 404.1502; SSR 96-2, 1996 WL 374188, at *1. This includes State agency physicians whose opinions must be considered by the ALJ. *Id*. Here, Drs. Misja, Flowers, and Hill each examined Plaintiff once for a psychological assessment. (Tr. 255, 294, 310). The ALJ is required to weigh the opinion of agency examining physicians under the same factors as treating physicians, including the supportability and consistency of those opinions. *See* 20 C.F.R. § 404.1527(c). Although the explanatory requirement "does not apply to opinions from physicians who . . . have examined but not treated a claimant, the ALJ's decision still must say enough to allow the appellate court to trace the path of his reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011). Thus, the question is not one of "good reasons", but rather whether the ALJ's reasoning in this regard is supported by substantial evidence. As discussed below, the undersigned concludes that it is.

### Dr. Misja

First, the ALJ evaluated the opinion of Dr. Misja and assigned it partial weight, explaining:

> The examiner opined the claimant to be able to understand and implement ordinary instructions but to have "severe" problems with interacting with others and responding appropriately to work pressures. Only partial weight is given as the opinion is based on a single examination and relies heavily on subjective reporting versus observed signs. Furthermore, no specific limitations were given in social interactions or adaptive functioning.

(Tr. 22). Here, the ALJ provided three reasons why he assigned partial weight to Dr. Misja: (1) the opinion is based on a single examination; (2) it relies heavily on Plaintiff's reported symptoms, rather than examination findings; and (3) the social and adaptive functioning limitations he opined were non-specific. *Id*. The undersigned finds these reasons are supported by substantial evidence. To Plaintiff's first argument, under the regulations, the length of treatment history is just one of the many factors an ALJ considers when assigning weight to a physician. *Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(c)(2)). Therefore, it was not improper for the ALJ to consider that Dr. Misja's opinion was based on a single, limited interaction.

The ALJ also found Dr. Misja's opinion relied heavily on Plaintiff's self-reported symptoms. (Tr. 23). This is also supported. For example, in the area of responding appropriately to supervision and coworkers in a work setting, Dr. Misja opined Plaintiff would have "severe" problems. (Tr. 261). He attributed this to Plaintiff's report that her symptoms had "interfered with virtually every relationship she's had including the workplace and she was fired from her last job because of it." *Id*. Dr. Misja also opined Plaintiff would have "severe" problems responding appropriately to work pressures. *Id*. He attributed this to Plaintiff's self-report that she spent 22 years at her last job, performing it well "in every way including job tasks and attendance. . . because she traveled and didn't have to work with the same people day and day out." *Id*. Importantly, this is the key difference between Dr. Misja's opinion and the opinions of Drs. Hill and Flowers. The ALJ reasonably found that Dr. Misja's opinion relied on Plaintiff's "on subjective reporting *versus observed signs*". (Tr. 23) (emphasis added). Unlike the other examiners, Dr. Misja did not tie any of his limitations to examination findings; rather they were based entirely on Plaintiff's self-report. (Tr. 261). The ALJ is also correct that these social and adaptive functioning assessments are non-specific in that they offer a "severe" limitation, but do not describe how these translate into

functional work abilities. Moreover, Plaintiff's argument that the ALJ erred by assigning Dr. Misja's opinion little weight for this reason while giving greater weight to Drs. Flowers and Hill when their opinions have a similar flaw is inconsequential. This is because the ALJ's decision to assign different weight to the opinions because one relies entirely on subjective reporting and the other two do not (as discussed above), is supported and provides sufficient explanation for the difference.

For these reasons, the undersigned finds the ALJ's analysis of Dr. Misja's opinion supported by substantial evidence.

### *Drs. Flowers and Hill*

Next, Plaintiff argues the ALJ erred in his evaluation of Drs. Flowers and Hill because (1) he did not consider that each offered a "guarded" prognosis; and (2) like Dr. Misja, neither offered a specific limitation regarding Plaintiff's social functioning. (Doc. 14, at 20-21). Plaintiff elaborates that, because neither offered such limitation, it was inconsistent for the ALJ to assign them great weight while assigning Dr. Misja little weight. *Id*. The Commissioner argues that (1) substantial evidence supports the ALJ's finding that Plaintiff had subsequent symptom improvement with medication and treatment; and (2) that the ALJ's evaluation of these opinions are supported by substantial evidence. (Doc. 17, at 11-13).

Here, the ALJ evaluated Dr. Flowers's opinion, explaining:

> Great weight is given to the opinion of the psychological examiner A. Flowers, Psy.D. (Exhibit 3F). The opinion concluded the claimant to have limits in understanding and carrying out instructions, performing multi-step tasks, and responding appropriately to work pressures. Great weight is given as the limitations are consistent with the overall examination, which noted restricted affect and difficulties with the mental status examination. The limitations are also consistent with the overall record of inappropriate social responses and difficulties with adaptive functioning as noted above.

(Tr. 22). The ALJ offered a similar explanation as to Dr. Hill, noting:

> Great weight is given to the opinion of the psychological consultative examiner A. Hill, Ph.D. (Exhibit 5F). The opinion concluded the claimant to have limitations in understanding, remembering, and carrying out instructions; maintaining attention and concentration; responding appropriately to others; and responding appropriately to work pressures. The opinion is generally consistent with the findings of the mental status examination and the overall record, including notes from treatment providers.

(Tr. 23).

First, Plaintiff argues the ALJ erred in failing to consider Drs. Flowers and Hill each offered a "guarded" prognosis. (Tr. 21). She argues "[t]his is significant considering the ALJ relied greatly on these opinions in finding Plaintiff could *sustain* full-time employment. . ." *See* Doc. 14, at 21 (emphasis in original). The Commissioner responds that the ALJ correctly observed that the overall record (including both of these opinions) noted the potential for, or documented, improvement in Plaintiff's symptoms following medication and treatment. (Doc. 17, at 13).

Plaintiff is correct that Drs. Flowers and Hill each offered a "guarded prognosis". (Tr. 299, 316-17). Dr. Flowers's guarded prognosis was due to Plaintiff's lack of treatment for her psychological symptoms. (Tr. 299) ("She []is not receiving mental health treatment for these symptoms. Prognosis may be improved with mental health treatment."). Similarly, Dr. Hill's "guarded" prognosis was offered because Plaintiff "ha[d] some good benefit from her mental health medication provided by her primary care provider", however, she found Plaintiff also "[did] not have full symptom control or relief." (Tr. 316-17). Of note, Plaintiff began seeing Dr. Thysseril three months after Dr. Hill issued her opinion (Tr. 385), and began counseling sessions with Ms. Brown less than four months after Dr. Flowers issued hers (Tr. 305).  In his opinion, the ALJ noted improvements in Plaintiff's condition, explaining, "even her treating psychiatrist noted improvement in mood and affect through 2016." (Tr. 22) (citing Tr. 403, 408, 423, 456). He also noted she had better symptom control with medications. *Id.* (citing Tr. 269, 296, 312, 316). The undersigned notes the ALJ's findings here are consistent with the "guarded" prognoses offered by

24

both doctors where each was based upon a belief that Plaintiff may obtain better symptom control through therapy or medication, and the ALJ reasonably found Plaintiff experienced such improvement.

Second, Plaintiff contends it was inconsistent for the ALJ to discount Dr. Misja's opinion because it lacked any specific functional limitations, but give great weight to the opinions of Drs. Hill and Flowers who similarly did not offer any specific functional limitations. However, as discussed above, the key difference between Dr. Misja's social functioning opinion and the opinions of Drs. Hill and Flowers is that Dr. Misja's social functioning opinion relies on Plaintiff's "subjective reporting *versus observed signs*". (Tr. 23) (emphasis added); *see also* Tr. 261. By contrast, Drs. Flowers and Hill based their opinions on their objective findings. For example, Dr. Flowers described Plaintiff's subjective reports of anger and irritability in social settings, but also found that, during the exam, she was able to interact appropriately. (Tr. 301). Further, Dr. Flowers pointed out that Plaintiff's reporting of her socialization abilities was "somewhat inconsistent", and she drove with a friend to her appointment that day. *Id.* Dr. Hill opined Plaintiff appeared "limited" in her social abilities based upon her "observed depressive and anxiety related symptomatology within her interactions within the clinical interview setting." (Tr. 319). While Plaintiff may be correct that none of the three examiner's opinions offer "specific" limitations such that they translate to work-related activity, the ALJ is correct that Drs. Flowers and Hill each tie their social limitations to examination findings where Dr. Misja did not, as discussed above. And importantly here, the ALJ's decision to assign Drs. Flowers and Hill "great weight" is supported by substantial evidence. As the ALJ noted, their opinions were primarily based on their examination findings. (Tr. 22-23) (citing Tr. 300-01, 318-19). The ALJ also found these opinions consistent with the overall record, including notes from treatment providers where Plaintiff was

found to be limited, but not severely so. (Tr. 22-23). As described in detail above, this reason is also supported by substantial evidence. And as noted, consistency and supportability are just two factors an ALJ must consider when determining the weight he assigns to consultative examiners. *See* 20 C.F.R. § 404.1527(c)

For these reasons, the undersigned finds Plaintiff's arguments as to Drs. Flowers and Hill not well-taken. The ALJ's analysis of each opinion is supported by substantial evidence, and the undersigned recommends the decision be affirmed in this regard as well.

Step Three

Next, Plaintiff challenges the ALJ's finding of less than "marked" limitation in three areas of mental functioning under Listing 12.00: (1) concentration, persistence or, pace; (2) adapting or managing oneself; and (3) interacting with others, arguing each finding is not supported by substantial evidence and that the ALJ mischaracterized the evidence in reaching this. (Doc. 14, at 22-25).[7] The Commissioner does not specifically address this argument. For the following reasons, the undersigned finds the ALJ's analysis supported by substantial evidence and recommends the decision be affirmed in this regard.

At Step Three, the ALJ concluded Plaintiff did not have an impairment (or combination of impairments) that met or medically equaled the severity of a listed impairment. (Tr. 18). In doing so, the ALJ expressly considered Listings 12.04, 12.06, 12.07, and 12.11. *Id*. Under the regulations, Listings 12.07 and 12.11 have two paragraphs, designated A and B, and a plaintiff's mental disorder must satisfy the requirements of both paragraphs. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x

---

7. Plaintiff does not expressly argue the ALJ erred at Step Three in his determination that she did not meet a listing. *See* Doc. 14, at 21-24. Rather, she specifically argues the ALJ mischaracterized, or omitted, certain evidence when evaluating the "paragraph B" criteria at Step Three, asserting that she is more limited than the ALJ found. *Id*. Because she frames the argument this way, the undersigned addresses it in the context of the relevant Listings

1, Listing 12.07, 12.11. Listings 12.04 and 12.06 have three paragraphs, designated A, B, and C, and a plaintiff's mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C. *Id*. at Listing 12.04, 12.06. Paragraph A of each Listing outlines the medical criteria that must be present in a plaintiff's medical evidence, paragraph B provides the functional criteria used to assess how a plaintiff's mental disorder limits her functioning, and paragraph C outlines the criteria used to evaluate "serious and persistent mental disorders". *Id*. Importantly here, Plaintiff does not argue she satisfies the paragraph A or C criteria for any of these Listings. Plaintiff only challenges the ALJ's findings with respect to the paragraph B criteria.

> Each of the four Listings considered by the ALJ share the same paragraph B criteria:
>
> > to evaluate how your mental disorder limits your functioning. These criteria represent the areas of mental functioning a person uses in a work setting. They are: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 12.00. To satisfy the paragraph B criteria, a plaintiff's mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. *Id*. Here, Plaintiff only challenges the ALJ's finding of "moderate" limitation in three: (1) concentration, persistence, or pace; (2) adapting or managing oneself; and (3) interacting with others, arguing record evidence supports greater limitation. (Doc. 14, at 22-25).

*Maintaining Concentration, Persistence, or Pace*

Plaintiff first argues the ALJ should have found a greater than "moderate" limitation in the area of maintaining concentration, persistence, or pace. With maintaining concentration, persistence, or pace, the listings provide as follows:

27

This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate. Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 12.00. In this area the ALJ found Plaintiff had moderate limitation, explaining:

She alleges poor concentration. She was not able to sustain training and she is not able to cook or do laundry. The claimant showed difficulties with serial numbers and calculations during two of her psychological consultative examinations (Exhibits 3F; 5F). She has been noted to have difficulties with sustained long [t]erm memory processing (Exhibit 11F). Formal attention and concentration testing indicated deficits consistent with ADHD.

(Tr. 18-19). The Court finds substantial evidence supports this determination. The ALJ acknowledged Plaintiff's poor performance in calculations during two consultative examinations, as well as difficulties with attention, concentration, and memory processing shown during a psychological assessment. *Id.* (citing Tr. 427-30). However, the ALJ also noted treatment notes indicated no abnormalities in memory (Tr. 22) (citing Tr. 394, 399, 404, 409, 414, 418, 424, 457, 462, 467, 477), or concentration (Tr. 330, 334, 338, 342, 346, 354, 358, 362). Additionally, he pointed out the psychological assessors noted Plaintiff's score on the MMPI-2-RF test, was indicative of someone likely exaggerating their symptoms. *Id.* (citing Tr. 430). In support of her position that the ALJ should have found greater than "moderate" limitation, Plaintiff cites much of the same evidence as the ALJ, but argues the evidence supports a greater limitation. (Doc. 14, at 23). The ALJ recognized Plaintiff had some limitation in this area, however, he found it to be not as severe as Plaintiff alleges. And, as noted above, this Court cannot overturn the ALJ's

findings "so long as substantial evidence [] supports the conclusion reached by the ALJ." *Jones*,

336 F.3d at 477. Further, the ALJ provided significant accommodations for these limitations in the

RFC. *See* Tr. 19 (limiting Plaintiff to work which requires no fast pace or production quotas). For

these reasons, substantial evidence supports the ALJ's finding that Plaintiff was less than markedly

limited in this area.

*Adapting or Managing Oneself*

Plaintiff next argues the ALJ should have found a greater than "moderate" limitation in the

area of adapting and managing oneself. In this area, the listings provide:

> This area of mental functioning refers to the abilities to regulate emotions, control
> behavior, and maintain well-being in a work setting. Examples include: Responding
> to demands; adapting to changes; managing your psychologically based symptoms;
> distinguishing between acceptable and unacceptable work performance; setting
> realistic goals; making plans for yourself independently of others; maintaining
> personal hygiene and attire appropriate to a work setting; and being aware of normal
> hazards and taking appropriate precautions. These examples illustrate the nature of
> this area of mental functioning. We do not require documentation of all of the
> examples.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 12.00. In support of his "moderate" limitation

finding, the ALJ explained:

> The claimant isolates herself. She is not able to go shopping or leave her home past
> her patio. She has had explosive anger fits. On the other hand, she was noted to be
> able to drive independently (Exhibits 1F; 3F). She has been noted to be dressed and
> groomed appropriately in examinations  (Exhibits 1F; 3F; 5F).

(Tr. 19). The Court finds substantial evidence also supports this determination. Here again, the

ALJ recognized Plaintiff's difficulties in this area. However, he also noted in contrast, Plaintiff's

ability to drive independently, *id*. (citing Tr. 258 (driving her mother to doctor's appointments),

297), and that she was dressed and groomed appropriately during examinations, *id*. (citing Tr. 258,

297-98, 314-15). In support of her position, Plaintiff notes that Dr. Thysseril opined Plaintiff had

more than "moderate" limitation in this area. (Doc. 14, at 23). However, as discussed above, the

ALJ elected not to assign great weight to this opinion and that determination is supported by substantial evidence. Additionally, Plaintiff cites other evidence in the record which, she alleges, should have pushed the ALJ into a more than "moderate" finding here. *Id*. Again, however, this Court cannot disturb the ALJ's findings if it is found to be supported by substantial evidence, even if evidence also supports the opposite conclusion. *Jones*, 336 F.3d at 477. And importantly, the ALJ provided accommodations for these limitations in the RFC. *See* Tr. 19 (limiting Plaintiff to work which requires no unprotected heights or moving mechanical parts and few changes in her work setting). Substantial evidence supports the ALJ's finding that Plaintiff was less than markedly limited in this area.

*Interacting with Others*

Finally, Plaintiff challenges the ALJ's finding of "moderate" limitation in the area of interacting with others. In this area, the listings provide:

> This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public. Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 12.00. Here, the ALJ found Plaintiff had moderate limitation, explaining:

> The claimant isolates herself and reports mood swings with both panic attacks and disproportionate anger. Her primary interaction is with her mother. The claimant has shown abnormalities in mood and affect during psychological consultative examinations (Exhibits 1F; 3F; 5F). During her most recent one, she was visibly shaking. On the other hand, she reported having friend support in getting around

> and generally functioning. She was noted to be polite and cooperative during her
> field office interview (Exhibit 3E).

(Tr. 18). The undersigned finds this explanation also supported by substantial evidence. As he did

with the other two areas, the ALJ recognized Plaintiff experienced difficulties in this area.

However, he weighed those against Plaintiff's friendships and her interactions with her providers.

*Id.* (citing Tr. 393, 398, 403, 408, 413, 423, 456, 461, 476 (Plaintiff's consistently cooperative

demeanor); Tr. 213 (Plaintiff's polite and professional demeanor during an interview); Tr. 301

(Plaintiff riding with a friend to her consultative examination); Tr. 592 (emergency room visit

where Plaintiff was actively engaged in her interview, was pleasant and courteous, and came across

as "open and unguarded")). Further, the ALJ accommodated Plaintiff's limitations in this area to

a *significant* degree within the RFC. *See* Tr. 19 (limiting Plaintiff to occasional and superficial

interaction with supervisors and coworkers, no interaction with the public, and no arbitration,

mediation, confrontation, negotiations, supervising others, or commercial driving.). These findings

provide substantial evidence for the ALJ's conclusion.

In support of her position, Plaintiff notes that Drs. Thysseril and Misja opined Plaintiff had

a more than "moderate" limitation. (Doc. 14, at 23-24). Again, as discussed above, the ALJ elected

not to assign great weight to these opinions and his finding there is supported by substantial

evidence. Additionally, Plaintiff cites other evidence in the record which, she alleges the ALJ

mischaracterized and warrants a more than "moderate" finding here. *Id.* Again, however, this Court

cannot disturb the ALJ's determination if it is supported by substantial evidence, even if evidence

exists which may lead someone to the opposite conclusion. *Jones*, 336 F.3d at 477.

Plaintiff argues that the ALJ's analysis of these areas of functioning is flawed, primarily

because the ALJ mischaracterized evidence when discussing each. In support, she points to several

points throughout the record which she thought the ALJ should have given more attention to, or

31

downplayed in his analysis. (Doc. 14, at 25). However, such a "cherry picking" argument goes both ways and is seldom successful for this reason: "because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014); *see also White v. Comm'r of Soc. Sec.,* 572 F.3d at 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence."). Plaintiff argues the ALJ only focused on the positives, where her brief certainly focuses on the negatives. Although Plaintiff does not agree with the ALJ's findings in these areas, "the ALJ reached his decision using correct legal standards and because those findings were supported by substantial evidence, the Court must affirm it, even if reasonable minds could disagree on whether the individual was disabled or substantial evidence could also support a contrary result." *Postell v. Comm'r of Soc. Sec*., 2018 WL 1477128 at * 10 (E.D. Mich.) (citing *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003)); s*ee also Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) ("If substantial evidence supports the Commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.").

RFC Argument

In her opening brief (Doc. 14), Plaintiff broadly characterizes her argument as an RFC argument, asserting that the the overall RFC finding is unsupported due to the ALJ's failure to properly consider (1) a treating physician and (2) all three consultative examiners. *See* Doc. 14, at 13-25. Specifically, as to the consultative examiners, she argues the ALJ erred because (1) he did not consider that Drs. Flowers and Hill each offered a "guarded" prognosis; and (2) his analysis of the three opinions are internally inconsistent. *Id.* at 20-21. The second part of Plaintiff's brief challenges three areas of mental functioning under subparagraph B of Listing 12.00: (1) interacting

with others; (2) maintaining concentration persistence or pace; and (3) adapting and managing oneself, specifically arguing the ALJ's analysis in these areas of functioning is unsupported because he ignored or mischaracterized portions of the record. (Doc. 14, at 22-25).

In Reply (Doc. 19), Plaintiff attempts to raise an entirely new argument asserting that the ALJ failed to incorporate specific limitations opined by Drs. Flowers and Hill into the RFC. *See* Doc. 19, at 2-3. She argues generally that "the ALJ's RFC finding did not accommodate the limitations identified by Dr Flowers and Dr. Hill", but then provides argument on only one specific limitation – Dr. Flowers' and Dr. Hill's opinion that Plaintiff would likely have difficulty with multi-step tasks. *Id.* (citing Tr. 300, 318). This argument is separate and distinct from those raised in the opening brief wherein Plaintiff only challenged the failure to consider the "guarded prognosis" notes, and the ALJ's inconsistencies in treatment of the opinions. Because Plaintiff did not raise this specific argument to the Court initially, it was waived and cannot be raised for the first time in a reply brief. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (arguments not raised in opening brief deemed waived). The undersigned therefore declines to address it.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and recommends the decision be affirmed.

 s/ James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time

WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).